Wesley M. Griffith, SBN 286390
**ALMEIDA LAW GROUP, LLC**
111 W. Ocean Blvd., Suite 426,
Long Beach, CA 90802
Telephone: 530-490-3178
E-mail: wes@almeidalawgroup.com

F. Peter Silva II, SBN 348070
**TYCKO & ZAVAREEI LLP**
333 H Street, Suite 5000
Chula Vista, CA 91911
Telephone: 202-973-0900
Email: psilva@tzlegal.com

David A. McGee*
**ALMEIDA LAW GROUP, LLC**
3133 Connecticut Ave NW
Washington, DC 20008
Telephone: 202-913-5681
E-mail: dmcgee@almeidalawgroup.com

Loc G. Ho*
**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Fl.
New York, NY 10023
Telephone: 347-808-6485
E-mail: loc@almeidalawgroup.com

*Pro hac vice* applications to be filed

*Attorneys for Plaintiff and the Putative Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN FLORES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SAN FRANCISCO BASEBALL ASSOCIATES LLC.<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

## INTRODUCTION

1.    For years, San Francisco Baseball Associates LLC (the "Giants") systemically cheated fans out of millions of dollars by falsely advertising their ticket prices for baseball games.

-1-

2.      Rather than disclosing the full cost of purchasing tickets upfront, the Giants tacked on last-minute "Service" fees, "Convenience" fees, "Handling and Convenience" fees, and "Order" processing fees that increased the cost of the purchase, exceeding the price initially advertised to the consumer, often by more than $50 per transaction.

3.      In other words, the Giants' advertised tickets were not actually available for purchase at the advertised prices.

4.      The goal of the Giants' false advertising was to convince consumers shopping for baseball tickets that San Francisco Giants tickets cost less than their actual price.

5.      Last minute, mandatory fees like those charged by the Giants are called "Junk Fees" by the Federal Trade Commission ("FTC"),[1] and this type of Junk Fee pricing strategy is commonly called "drip pricing" or "bait and switch" advertising.

6.      Junk Fees, drip pricing, and bait and switch advertising are not just wrong—they are illegal in California.

7.      On October 7, 2023, California enacted law S.B. 478 (the "Honest Pricing Act"), which expressly banned Junk Fees. *See* Cal. Civ. Code § 1770(a)(29)(A) (prohibiting businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges"). The Honest Pricing Act became effective on July 1, 2024.

8.      Critically, the Honest Pricing Act confirmed that drip pricing and bait and switch advertising were already illegal in California, providing that the "act is intended to specifically prohibit drip pricing, which . . . like other forms of bait and switch advertising, is prohibited by *existing* statutes, including the Unfair Competition Law . . . and the False Advertising Law." *Id.* at § 1(a)-(b) (emphasis added).

---

[1] As defined by the FTC, "Junk Fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer" or fees that are "hidden," such as those "disclosed only at a later stage in the consumer's purchasing process or not at all." *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464), *available at* https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-fees-trade-regulation-rule-commission-matter-no-r207011 (cleaned up).

9.      As former President Joe Biden explained before he left office, "junk fees may not matter to the very wealthy, but they matter to most other folks in homes like the one I grew up in, like many of you did. They add up to hundreds of dollars a month. They make it harder for you to pay your bills . . . ."[2]

10.     Although on or about July 2024 the Giants stopped charging undisclosed Junk Fees, they have not refunded fans the millions of dollars in Junk Fees that those fans have been charged.

11.     Plaintiff Juan Flores's experience is instructive.   In March 2024, Mr. Flores purchased two tickets online for a San Diego Padres vs. San Francisco Giants game scheduled in April 2024. The price initially advertised to Mr. Flores was $10.00 per ticket, for a total price of $20.00.  However, at checkout, he was charged a $5.50 "Convenience" fee and a $3.50 "Order" processing fee—or $9.00 in mandatory Junk Fees—which were undisclosed before checkout.

12.     The last-minute addition of $9.00 in Junk Fees reflected a price increase of 45% of the total sales price.

13.     The initially advertised price of $10.00 per ticket was material to Mr. Flores's decision to proceed with this transaction.

14.     Had he been aware of the mandatory Junk Fees at the start of the transaction and received the true total price, inclusive of Junk Fees, for the two tickets upfront instead of at the last minute, Mr. Flores would not have purchased the specific tickets he purchased and instead would have attempted to buy tickets for different seats or from another seller at a lower total price.

15.     Hundreds of thousands of other consumers have had materially identical experiences.

16.     Plaintiff Flores ("Plaintiff") brings this action to force the Giants to pay back the unlawfully charged Junk Fees to Californians and other impacted consumers.

---

[2] The White House, *President Biden's State of the Union Address*, The White House (Feb. 7, 2023), https://web.archive.org/web/20250106155151/https://www.whitehouse.gov/state-of-the-union-2023/ (last visited Jan. 26, 2026).

1

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

2    17.    The District Court of the Northern District of California has personal jurisdiction

3  over the parties in this matter because Juan Flores consents to the personal jurisdiction of this Court

4  for purposes of this action and the Giants' principal place of business is in this District. Within this

5  District, the Giants also conduct extensive business—including by having charged the unlawful

6  Junk Fees that are at issue in this litigation.

7    18.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act,

8  28 U.S.C. § 1332(d), because there exists minimal diversity between class members and Defendant

9  and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

10    19.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because

11  Defendant's principal place of business is located in this District and a substantial part of the events

12  giving rise to this action occurred in this District.

13    20.    **Divisional Assignment:** Pursuant to Local Rules 3-2(c) and 3-5(b), Plaintiff further

14  states that assignment to the San Franscisco or Oakland Division of this Court is proper because a

15  substantial part of the events at issue in this lawsuit occurred in this District, which pursuant to

16  Local Rule 3-2(d) provides for assignment to the San Franscisco or Oakland Division.

17    21.    Pursuant to California Civil Code Section 1780(d), a declaration from Plaintiff is

18  attached as **Exhibit A**, confirming that venue is proper.

19

## THE PARTIES

20  **A.    Plaintiff**

21    22.    At all times relevant to this action, Plaintiff Juan Flores was over the age of 18 and

22  was a resident of Los Angeles, California.

23  **B.    Defendant**

24    23.    Defendant San Francisco Baseball Associates LLC is a limited liability company

25  registered under the laws of Delaware, with its principal place of business in San Francisco,

26  California. San Francisco Baseball Associates LLC operates the San Francisco Giants Major

27  League Baseball team and the Oracle Park baseball stadium.

28

24.    The Giants have, at all relevant times, conducted business within the State and this District, including by charging the Junk Fees that are the subject of this litigation.

## FACTUAL ALLEGATIONS

**A.    Companies Use Junk Fees to Trick Customers into Paying More than They Otherwise Would for Goods and Services.**

25.    Large, sophisticated companies—like the Giants—with large, sophisticated marketing departments know that Junk Fees ensure consumers pay more for a good or service than they otherwise would or should pay.

26.    Indeed, the White House estimates that Junk Fees cost consumers over $90 billion each year in the United States.[3]

27.    One of the most common Junk Fee pricing techniques is called "drip pricing," where a company does not disclose the total price of a product or service until late in the purchase process or incrementally discloses fees to the consumer throughout the transaction, after consumers have already expended time and effort and committed to the originally disclosed price.

28.    Once a consumer decides what to buy, he is unlikely to depart from that decision because of the "additional cognitive effort" involved in resuming his search.[4]

29.    In other words, omitting Junk Fees from the advertised price induces consumers to pay a higher total price than they otherwise would have.

30.    Indeed, as the companies that engage in Junk Fee practices are well aware, consumers choose a product or service based on the advertised disclosed "base price," and not based on the dripped price, especially when Junk Fees are not adequately disclosed.[5]

---

[3] The White House, *Readout of White House State Legislators Convening on Junk Fees*, The White House (April 24, 2024), https://web.archive.org/web/20250116070341/https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/24/readout-of-white-house-state-legislators-convening-on-junk-fees/ (last visited Jan. 26, 2026).

[4] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16-17, https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

[5] Alexander Rasch *et al.*, *Drip pricing and its regulation: Experimental evidence*, 176 J. Econ. Behavior & Org. 353 (2020),

31.     Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip sizes . . . consumers more frequently fail to identify the cheapest offer."[6]

32.     In fact, studies show that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[7]

33.     As the FTC's Bureau of Economics has explained, the use of Junk Fees and drip pricing adds steps to the process of determining the actual price of a good or service, which forces consumers to pay more than they would if presented with fully disclosed prices, including all applicable fees.[8]

34.     As a result, consumers are forced either to "incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [purchase], or both."[9]

35.     The FTC has thus characterized Junk Fees as especially egregious when they are hidden (i.e., "disclosed only at a later stage in the consumer's purchasing process or not at all"), because openly disclosed Junk Fees would enable consumers to determine whether or not the cost is favorable compared to those prices listed by competitors.[10]

---

https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("[B]uyers . . . . based their purchase decision exclusively on the base price.") (last visited Jan. 26, 2026).

[6] *Id.*

[7] Shelle Santa *et al.*, *Consumer Reactions to Drip Pricing*, Marketing Science (Jan. 15, 2020), at 189-90, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3924320 (last visited Jan. 26, 2026).

[8] Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, *supra* note 4, at 2-3.

[9] *Id.* at 4; *see also* David Friedman, *Regulating Drip Pricing*, 31 Stanford Law & Policy Review 51 (Feb. 18, 2019), at 67, https://ssrn.com/abstract=3337073 (last visited Jan. 26, 2026) ("[S]ellers provide buyers with the 'initial value' in the form of the initially-presented base price. . . . Buyers are influenced by the initial value, so a lower base price would create the impression of a lower overall price." (citing Gorkan Ahmetoglu *et al.*, *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. Retailing & Cons. Services 696, 697 (2014))).

[10] *See, e.g.*, Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified 16 C.F.R. Part 464) ("After a market leader took unilateral action to phase out hidden fees, the platform 'lost significant market share and abandoned the policy after a year because consumers perceived the platform's advertised prices to be higher than its competitors' displayed prices.'" (citation omitted)).

36.     Moreover, drip pricing runs afoul of the FTC Act itself. *See* 15 U.S.C. § 45(a)(1) (declaring unlawful "unfair or deceptive acts or practices in or affecting commerce"). And the FTC's guidance on bait and switch advertising states that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a). If the first contact is secured by the deceptive bait advertisement, it violates law even if the true facts are later made known to the buyer. 16 C.F.R. § 238.2(b). Through drip and/or partitioned pricing, companies induce consumers to choose a product or service based on an advertised price (i.e., the "bait"), despite ultimately charging a different and higher price than advertised (the "switch").

37.     Given this, it is no surprise that companies are motivated to hide Junk Fees through drip pricing for as long as possible in the search and purchase process, as duping consumers into paying Junk Fees brings in substantial revenue.

38.     In many instances, companies even compound the benefit they obtain through these practices by increasing Junk Fees at a higher rate than they increase the base price of the underlying product or service itself.[11] As a result, the product or service appears cheaper to consumers than competitor's products or services, even though the total cost of the product or service, inclusive of Junk Fees, is equally if not more expensive than those other companies' products or services.[12]

39.     Companies are also able to increase hidden Junk Fees without suffering meaningful market consequences.[13] In particular, companies are free to charge excessive Junk Fees in part because drip pricing impedes fair, honest, and free market competition.[14]

40.     Hence, through drip pricing, companies can charge excessive Junk Fees while skirting economic consequences, as shrouding the fee avoids deterring consumers from purchasing a given product or service based on a Junk Fee and its effect on the total price.

---

[11] *Id.*

[12] *See id.*

[13] Rasch *et al.*, *Drip pricing and its regulation: Experimental evidence*, *supra* note 5.

[14] *Id.* ("[F]irms fiercely compete in base prices but not in drip prices," so "total price increases when firms use drip pricing.").

41.    Meanwhile, competitor companies and consumers face the consequences. Companies that engage in drip pricing will lure consumers away from honest competitors that do not engage in such practices (and thus appear to charge higher prices) and the dishonest companies will earn a larger share and make higher profits than those competitors.[15]

42.    Junk Fees charged through drip and/or partitioned pricing also generate significant burdens for individual consumers.[16] Separating Junk Fees that consumers are obligated to pay in order to purchase a ticket from advertised ticket prices without first disclosing the total price burdens consumers by artificially increasing the search costs and the cognitive costs of finding and purchasing tickets to sporting events. Unless the total price is disclosed upfront, consumers are not reasonably able to make an informed decision on which product or service would be most favorable for them to purchase and instead tend to pay more for the product or service.[17]

43.    Put simply, Junk Fees and drip pricing are bad for consumers, are bad for businesses, and are bad for competition.

**B.    California's Junk Fee Ban.**

44.    Given the widespread use of Junk Fees, drip pricing, and bait and switch tactics in various consumer industries, in 2023, California took decisive action to protect its citizens.

45.    On October 7, 2023, California enacted the Honest Pricing Act, which expressly banned Junk Fees in California by prohibiting businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges." Cal. Civ. Code § 1770(a)(29)(A).

46.    Critically, the Honest Pricing Act confirmed that drip pricing and bait and switch advertising were already illegal in California, providing that the "act is intended to specifically prohibit drip pricing, which . . . like other forms of bait and switch advertising, is prohibited by

---

[15] *Id.* ("[W]here there is uncertainty about the drip size, sellers with a high drip-price limit can earn profits above the competitive level.").

[16] *See* Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified 16 C.F.R. Part 464) (explaining that "[c]onsumers faced with such fees pay upward of twenty percent more than when the actual price was disclosed upfront," and, as a result, such fees "impose substantial economic harms on consumers").

[17] *See id.*

*existing* statutes, including the Unfair Competition Law . . . and the False Advertising Law." *Id.* at § 1(a)-(b) (emphasis added).

47.    To help guide businesses into compliance with the law, on May 8, 2024, the California Office of the Attorney General issued a robust set of "Frequently Asked Questions" about drip pricing.[18]

/ / /

/ / /

/ / /

---

[18] https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf (last visited Jan. 26, 2026).

48.　　Among other guidance, the Attorney General's FAQs answer the following core questions:

Put simply, ***the price a Californian sees should be the price they pay.***

In order to help businesses comply with this new law, and to offer consumers guidance about what they can expect, the Attorney General's Office is releasing a set of FAQs. The law is found at Section 1770(a)(29) of the California Civil Code.

**What is the purpose of this law?**

The law is "intended to specifically prohibit drip pricing, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service." Advertising or listing a price that is less than what a consumer will eventually be charged is a form of deceptive advertising that also violates existing state and federal law. Truthful price advertising and listing helps businesses compete fairly on price and allows consumers to make accurate price comparisons.

**What does the new law require?**

The law requires honest pricing. It prohibits businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges" other than government-imposed taxes or fees or reasonable shipping costs. The text of the law can be found at section 1770(a) (29) of the California Civil Code.

**What can a business exclude from the advertised price under this law?**

The listed or advertised price does not need to include taxes and/or fees that the government imposes on the transaction, such as sales tax. In addition, the listed or advertised price does not need to include reasonable shipping costs for physical goods.

**Can a business comply with this law by disclosing additional required fees before a consumer finalizes a transaction?**

No. The price listed to the consumer must be the full price that the consumer is required to pay.

**Can a business comply with this law by advertising a price that is less than what a consumer will actually have to pay, but disclosing that additional fees will be added?**

No. The price advertised to the consumer must be the full price that the consumer is required to pay.

**Can a business comply with this law by listing or advertising one price and separately stating that an additional percentage fee will apply?**

No. The price listed or advertised to the consumer must be the full price that the consumer is required to pay.

**Can a business comply with this law by advertising the total price for a good or service and separately noting that the total price includes certain fees and charges?**

Yes. The price advertised to the consumer must be the full price that the consumer is required to pay. But the law does not limit a merchant's ability to include fees or charges in that total price, or to tell consumers that its prices include those fees or charges.

**Does this law prohibit a business from advertising one price and adding a variable service fee later in the transaction?**

Yes. The price listed or advertised to the consumer must be the full price that the consumer is required to pay.

## C.　The Giants' Deceptive Junk Fee Advertising.

49.　　By not including Junk Fees in its advertised ticket prices for online sales until approximately July 2024, the Giants misrepresented and concealed the actual cost of tickets from customers.

50.    To purchase tickets online through the Giants' official website https://www.mlb.com/giants (the "Giants' Website" or "Website"), a consumer would visit the Website and click the "Tickets" tab on the homepage.

51.    After clicking "Buy Now" on the following page, the consumer received a variety of potential game options sorted by date.

52.    Each game option displayed the date, the opposing team, the location and time, and purported lowest ticket pricing information.  The purported lowest ticket pricing information would be indicated via the phrase "Starting at" next to the purportedly lowest ticket price available and a "Buy Tickets" button, but did not include the true price of tickets, as mandatory Junk Fees were not included in the quoted prices.

53.    Even when a consumer clicked "Buy Tickets," the consumer was still not presented with an accurate and complete ticket price that included the Junk Fees. The consumer was instead led to a page that showed a map of Oracle Park with sections of available seating that the consumer could select, as well as different search options, including the number of tickets to be purchased, an option for accessible seats, and a price range for available tickets.

54.    Due to this drip pricing, consumers could not search for tickets within their desired price range because the full price was not displayed and could not meaningfully comparison shop with other ticket sellers.

55.    When a consumer selected a section of seating on the page showing a map of Oracle Park and different search options including the price range for available tickets, they were taken to the next page, which displayed a map of the selected section, the available seats within the section, and the ticket price for the seat the consumer selected—exclusive of Junk Fees.  In Mr. Flores's transaction, as further detailed below, this page advertised a price of $10.00 per ticket, exclusive of Junk Fees, when Mr. Flores selected his desired section and seats.

56.    After the consumer selected a seat on this page, they were prompted to sign in or create an account on mlb.com, or continue as guest.

57.    After a consumer signed into their account or chose to continue as guest, they were taken to a timed checkout screen. At the top of the checkout screen, the Giants showed the ticket

price exclusive of Junk Fees in larger, bolded font—$10.00 in Mr. Flores's transaction. Consumers then had to scroll through options to purchase parking, make a donation, select their delivery method, select their payment method, enter payment details, and indicate their messaging preferences.

58.    Only once consumers finally reached the bottom of the page did the Giants disclose the true total price, in a "Total Amount Due" section that separately listed out the subtotal, Junk Fees, and total amount due for the transaction.  In Mr. Flores's transaction, where he purchased two tickets for an initially advertised price of $10.00 each, or $20.00 total, the Giants finally disclosed the true total price of $29.00 at the bottom of the timed checkout screen. The Total Amount Due section separately listed out the initially advertised price of $20.00 as the subtotal and two mandatory Junk Fees: a $5.50 "Convenience" fee, and a $3.50 "Order" processing fee.

59.    A consumer who was lured in by the Giants' initial advertised prices would ultimately be made to pay a substantial percentage more.  In Mr. Flores's transaction, despite an initial advertised total price of $20.00, he was ultimately made to pay 45% more.

60.    Nowhere during the purchase flow did the Giants explain the purpose of the Junk Fees, or how those fees were calculated.

61.    To make matters worse and to add pressure to further interfere with user decision-making, in the upper right corner of the page, the Giants included a countdown clock. While the countdown clock runs, consumers (1) must review all of the information on the checkout screen regarding fees and add-on items, such as parking, ticket delivery, and donations, (2) must add their payment information (3) are expected to read and agree to the Giants' "Terms & Conditions," which, if printed on standard 8.5"x11" paper would total 15 pages, and (4) must notice and understand the increase in the cost of their tickets. The countdown clock adds pressure designed to interfere with consumers' decision-making and ensures that users are rushed to complete the purchase—despite the exorbitant fees tacked on at the end of the transaction after consumers are well down the path to purchase.

-12-

62.    Although the Giants finally provided a "Total Amount Due," it is at the bottom of the last page of the purchase process, at which time a consumer has already invested time and effort into selecting and purchasing a ticket, and has already psychologically committed to the ticket.

63.    Because of the Giants' deceptive Junk Fee practices, the Giants advertised a price (such as $10.00 per ticket in Mr. Flores's transaction) at which they did not intend, and were not willing, to sell the ticket. And because of these deceptive Junk Fee practices, an online consumer could not reasonably compare the total price of one ticket against the price of another ticket for a different seat or a ticket sold by another seller.

64.    For these reasons, the Giants' presentation of their Junk Fees is an unfair and deceptive trade practice.

65.    During the purchase process, the Giants advertised a ticket price that did not include Junk Fees. Even when they finally disclosed the Junk Fees at the end of the process, the Junk Fees were partitioned from the ticket price. Although the Junk Fees were not conspicuously disclosed, consumers could not purchase a ticket online without paying Junk Fees to the Giants.

**D.    No Arbitration Agreement Exists Between Consumers and the Giants.**

66.    When purchasing tickets online from the Giants, consumers, including Plaintiff, never made any arbitration agreement with the Giants.

67.    In an analogous case, *National Consumers League v. Washington Nationals Baseball Club LLC*, a court denied a motion to compel arbitration filed by the Washington Nationals Baseball Club LLC (the "Nationals"). *See* No. 2024-CAB-4483, 2025 WL 3541433 (D.C. Super. Sept. 16, 2025).

68.    That case involved substantially the same Junk Fee practices on the Nationals' official website, https://www.mlb.com/nationals, which is the same website in all relevant respects as the Giants' Website. *See id.*, No. 2024-CAB-4483, Dkt. No. 1, Complaint, ¶¶ 18-39; *see also Gustafson v. Washington Nationals Baseball Club, LLC*, Case No. 1:25-CV-03033 (D.D.C. Sept. 5, 2025), Complaint, ¶¶ 59-73 (further illustrating online ticket purchasing process on the Nationals' official website).  The case also involved substantially the same terms of use—and

arbitration agreement within the terms of use—as the Terms of Use ("Terms of Use") of the Giants' Website.  *See Nat'l Consumers League*, 2025 WL 3541433, at *1.

69.    Under *National Consumers League*, to the extent that consumers agreed to any arbitration clause in the Terms of Use of the Giants' Website, that agreement was, by its express terms, between the consumer and the website operator—not the Giants—and intended to be exclusive to only the consumer and website operator. *See id.* at *7.

70.    The Giants are not a party to the Terms of Use and are not interchangeable with the website operator under the Terms of Use.  *See id.* at *6-7.

71.    Nor do the Giants have a direct or intertwined relationship with the website operator, such as a corporate affiliate, alter ego, or parent-subsidiary relationship. *See id* at *5-6.

72.    Further, the Terms of Use do not vest the Giants with rights and responsibilities or otherwise make the Giants integral to the agreement.  *See id.* at *6.

73.    The Giants thus cannot enforce any arbitration clause in the Terms of Use to the extent consumers agreed to such a clause.  *See id.* at *2.

**E.    Plaintiff's Experience with the Giants.**

74.    Plaintiff is a citizen of California who has been subjected to the Giants' deceptive Junk Fee practices.

75.    On March 17, 2024, Plaintiff Juan Flores purchased two tickets online using the Giants' Website for a San Diego Padres vs. San Francisco Giants game held at Oracle Park on April 6, 2024 (the "Padres at Giants Game").

76.    Consistent with the online Giants ticket purchasing process described above, when Mr. Flores searched for tickets on the Giants' Website, he received a variety of potential game options with purported lowest ticket pricing information and an option to "Buy Tickets," including for the Padres at Giants Game.

77.    When Mr. Flores clicked "Buy Tickets," he was led to a page that showed tickets available for range of prices based on seating section.  This advertised price range did not include Junk Fees.

78.    After Mr. Flores selected a section of seating, he was taken to the next page, where he selected two seats within his selected seating section for an initial advertised price of $10.00 each, expecting to pay $20.00 total.  The advertised price of $10.00 per ticket still did not include Junk Fees.

79.    The initially advertised price of $10.00 per ticket was material to Mr. Flores' decision to proceed with this transaction.

80.    Once Mr. Flores selected his desired seats, he signed into his account on mlb.com and was taken to a timed checkout screen, where the Giants again showed the initial advertised ticket price, exclusive of Junk Fees, of $10.00 per ticket, for a total of $20.00 for two tickets. Mr. Flores continued to rely on the initial price of $10.00 per ticket, and the total price of $20.00 for the two tickets, while proceeding with the transaction.

81.    On the timed checkout screen, Mr. Flores then had to scroll through options to purchase parking, make a donation, select his delivery method, select his payment method, enter payment details, and indicate his messaging preferences.

82.    Only once Mr. Flores finally reached the bottom of the page did the Giants disclose the true total price of the two tickets—$29.00. This price included $9.00 in Junk Fees—a $5.50 "Convenience" fee and a $3.50 "Order" processing fee.

83.    Despite the initial advertised total price of $20.00, Mr. Flores was ultimately made to pay 45% more in last-minute, mandatory Junk Fees, as his transaction receipt indicates:

Thank you for your order. Here is a summary of your purchase:

**Padres at Giants**
Saturday 04/06/24 at 6:05PM
View Reserve Left Field

| Section | Row | Seat | Price |
|---|---|---|---|
| **TYPE:** CORONA SPECIAL OFFER | | | |
| VR333 | 12 | 21 | $10.00 |
| VR333 | 12 | 22 | $10.00 |
| | | Subtotal: | $20.00 |
| | | Convenience Fee: | $5.50 |
| | | Order Fee: | $3.50 |
| | | **Total:** | **$29.00** |

-15-

84.    The Giants did not explain at any point during the purchase flow the purpose of the "Convenience" fee or the "Order" processing fee, or how those fees were calculated.

85.    Although the Giants finally provided a "Total Amount Due," it was at the bottom of the last page of the purchase process, at which time Mr. Flores already invested substantial time and effort into selecting and purchasing tickets and has already psychologically committed to the tickets.

86.    Had Mr. Flores been aware of the mandatory Junk Fees at the start of the transaction and received the true total price of $29.00 for the two tickets upfront instead of at the last minute, Mr. Flores would not have purchased the specific tickets and instead would have attempted to buy tickets for different seats or from another seller at a lower total price.

87.    Mr. Flores thus paid more for the tickets than he otherwise would have as a result of the Giants' practices described herein.

## CLASS ALLEGATIONS

88.    This action is brought and may properly proceed as a class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), including, without limitation, Sections (b)(2) and (b)(3) of Rule 23.

89.    Plaintiff seeks certification of the following class (the "Class"):

> All persons who purchased a ticket from Defendant through the MLB Ballpark app or through the desktop or mobile versions of mlb.com who paid a service fee, convenience fee, order processing fee, and/or other similar fee to Defendant that was not included in the originally displayed price.

90.    The Giants' deceptive Junk Fee practices violated each Class member's individual statutory right to truthful information from the Giants about the actual price of live event tickets purchased, leased, or received in California.

91.    The Giants' deceptive Junk Fee practices have resulted in actual injury and harm to the Class members in the amount of the Junk Fees which were absent from the advertised price and which they paid as a result of the Giants' illegal Junk Fee practices.

92.    In addition, because the Giants withheld from Class members true ticket prices until the last minute, after Class members had already invested time, effort, and psychological

-16-

commitment, Class members could not reasonably determine the true price of a ticket upfront and compare the true ticket price with competitors' prices.

93.     Class members were thus forced to incur higher total search and cognitive costs to search for full pricing information that should have been provided upfront or make uninformed decisions that they otherwise would not have made had the Giants initially disclosed the true price of tickets.

94.     Accordingly, the Giants' deceptive Junk Fee practices resulted in additional actual injury and harm to Class members by forcing them to waste time and effort searching for full pricing information to determine and compare the true price of tickets or by forcing them to make uninformed decisions about which tickets would be most favorable to purchase.

95.     Plaintiff explicitly reserves his right to amend, add to, modify, and/or otherwise change the proposed class definition as discovery in this action progresses.

96.     The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel, and non-attorney employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

97.     **Numerosity.** Plaintiff is informed and believes that there are hundreds of thousands of members of the Class. The Class is so large that the joinder of all of its members is impracticable. The exact number of members of the class can be determined from information in the possession and control of the Giants.

98.     **Commonality.** The Giants have acted or refused to act on grounds that apply generally to the Class. Absent certification of the Class, the relief sought creates the possibility of

inconsistent judgments and/or obligations imposed on the Giants. Numerous common issues of fact and law exist, including, without limitation:

    a.    Whether Defendant is a "person" within the meaning of Section 1761(c).

    b.    Whether Plaintiff is a "consumer" within the meaning of Section 1761(d).

    c.    Whether the Giants' Junk Fee practices violated Section 1770(a)(9), which prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

    d.    Whether the Giants' Junk Fee practices violated any other provisions of California's Consumer Legal Remedies Act ("CLRA").

    e.    Whether the Giants' Junk Fee practices violated California's Unfair Competition Law ("UCL") and/or California's False Advertising Law ("FAL").

    f.    Whether the Giants made standardized representations to consumers.

    g.    Whether the Giants charged standardized Junk Fees to consumers.

    h.    The dates of the Giants' practices and any purported changes to those practices.

99.    **Predominance.** These common issues predominate over individualized inquiries in this action because the Giants' liability can be established as to all members of the Class as discussed herein.

100.    **Typicality.** Plaintiff's claims against the Giants and experience with the Giants are typical, if not identical, to the claims and experiences of members of the Class because, among other reasons, Plaintiff's claims arise from the Giants' practices that are applicable to the entire Class.

101.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money by paying Junk Fees to the Giants. Plaintiff also has no interests antagonistic to those of the Class, and the Giants have no defenses unique to

Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the Class.

102.    **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to recover damages; the damages suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have legal recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiff and his counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

103.    Plaintiff reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## CAUSES OF ACTION

**A.    First Cause of Action: Violation of California's Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.,* on Behalf of Plaintiff and the Class.**

104.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 103 of this Complaint.

105.    At all relevant times, Plaintiff and Class members were "consumers" within the meaning of the CLRA, as they were individuals seeking or acquiring, by purchase or lease, goods or services for personal, family, or household purposes.

106.    The Giants' actions and conduct constituted transactions for the sale or lease of goods or services to consumers under the CLRA, namely the selling of live event tickets and charging of mandatory Junk Fees that exceeded the price initially advertised and/or displayed to consumers.

107.    The Giants violated the CLRA by, among other things, making materially false statements and omitting truthful information about the Junk Fees charged to Plaintiff and the Class.

108.    The Giants violated Section 1770(a)(9), which prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

109.    Additionally, the Giants violated the CLRA by:

    a.    **"**Representing that goods or services have . . . characteristics . . . that they do not have" (a)(5);

    b.    "Advertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity (a)(10);

    c.    "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (a)(14); and

    d.    "Advertising that a product is being offered at a specific price plus a specific percentage of that price unless (A) the total price is set forth in the advertisement, which may include, but is not limited to, shelf tags, displays, and media advertising, in a size larger than any other price in that advertisement, and (B) the specific price plus a specific percentage of that price represents a markup from the seller's costs or from the wholesale price of the product" (a)(20).

110.    The Giants' actions and misrepresentations were material, and the Giants' violations of the CLRA were a substantial factor in causing Plaintiff and the Class to incur the Junk Fee charges.

111.    As a direct and proximate consequence of these actions, Plaintiff and the Class suffered injury.

112.    The Giants' conduct was malicious, fraudulent, and wanton in that it intentionally and knowingly provided misleading information to Plaintiff and the Class for the Giants' own benefit to the detriment of Plaintiff and the Class.

113.    At this time, Plaintiff only seeks injunctive and declaratory relief and attorney's fees and costs for this cause of action.[19]

**B.    Second Cause of Action: Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.,* on Behalf of Plaintiff and the Class.**

114.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 103 of this Complaint.

115.    The Giants, Plaintiff, and Class members are "persons" within the meaning of the UCL.

116.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

117.    The Giants' practices of charging Junk Fees were "unlawful" within the meaning of the UCL because, among other things, those Junk Fees violated the CLRA, with Section 1770(a)(9) prohibiting "[a]dvertising goods or services with intent not to sell them as advertised," among other unlawful practices engaged in by the Giants.

118.    The Junk Fees were also unlawful under the UCL because they violated the False Advertising Act (as detailed in the Third Cause of Action below) and also violated the FTC Act (as alleged above).

119.    The acts and practices of the Giants as alleged herein also constituted "unfair" business acts and practices under the UCL because the Giants' conduct was unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of the Giants' conduct outweighed any conceivable benefit of such conduct.

120.    The Giants have, in the course of business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices by tricking consumers into paying Junk Fees by failing to display those prices in the initially advertised prices.

---

[19] Pursuant to Section 1782(d) of the CLRA, Plaintiff expressly reserves his right to amend his CLRA cause of action to add claims for monetary relief, including, without limitation, for actual, punitive, statutory, and restitutionary damages, at least 30 days after providing the Giants the notice contemplated by Section 1782(a).

121.    The Giants have, in the course of business and in the course of trade or commerce, charged these unlawful Junk Fees to Plaintiff and the Class.

122.    Plaintiff and the Class have suffered injury in fact—in the form of Junk Fees—and have lost money as a result of the Giants' unlawful business acts and practices.

123.    Plaintiff and the Class seek an order providing restitution and disgorgement of all Junk Fees paid to the Giants.

124.    Plaintiff and the Class further seek their attorney's fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiff and the Class seek to enforce "an important right affecting the public interest" in bringing this cause of action.

**C.    Third Cause of Action: Violation of California's False Advertising Law, Cal. Civ. Code §§ 17500 *et seq.*, on Behalf of Plaintiff and the Class.**

125.    Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 103 of this Complaint.

126.    In violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.,* the Giants' advertisements, policies, acts, and practices described in this Complaint were designed to cause Plaintiff and the Class to pay Junk Fees to the Giants, and did in fact result in Plaintiff and the Class paying unlawful Junk Fees to the Giants.

127.    The Giants knew or reasonably should have known that representations on their Website were false and deceptive.

128.    As alleged in this Complaint, the Giants' unfair, unconscionable, deceptive acts, practices, omissions, and/or affirmative misstatements include, but are not limited to, displaying and advertising an initial price for which a consumer could not actually complete the transaction.

129.    As a result, Plaintiff and the Class are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which the Giants were unjustly enriched.

130.    Plaintiff and the Class further seek their attorney's fees and costs pursuant to California Code of Civil Procedure Section 1021.5 because Plaintiff and the Class seek to enforce "an important right affecting the public interest" in bringing this cause of action.

**PRAYER FOR RELIEF**

131.    WHEREFORE, Plaintiff and members of the Class seek an Order:

a.    Certifying the proposed Class pursuant to Rule 23, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

b.    Declaring that the Giants are financially responsible for notifying the Class members of the pendency of this suit;

c.    Declaring that the Giants have committed the violations of law alleged herein;

d.    Awarding statutory damages in the maximum amount for which the law provides;

e.    Awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

f.    Providing for any and all equitable monetary relief, including, without limitation, restitution, the Court deems appropriate;

g.    Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

h.    Awarding Plaintiff his reasonable costs and expenses of suit, including attorney's fees;

i.    Awarding pre- and post-judgment interest to extent the law allows; and

j.    Providing such further relief as this Court may deem just and proper.

Respectfully submitted,

Dated: January 26, 2026

*/s/ Wesley M. Griffith*
Wesley M. Griffith, SBN 286390
**ALMEIDA LAW GROUP, LLC**
111 W. Ocean Blvd., Suite 426,
Long Beach, CA 90802
Telephone: 530-490-3178
E-mail: wes@almeidalawgroup.com

F. Peter Silva II, SBN 348070
**TYCKO & ZAVAREEI LLP**
333 H Street, Suite 5000
Chula Vista, CA 91911
Telephone: 202-973-0900
Email: psilva@tzlegal.com

David A. McGee*
**ALMEIDA LAW GROUP, LLC**
3133 Connecticut Ave NW
Washington, DC 20008
Telephone: 202-913-5681
E-mail: dmcgee@almeidalawgroup.com

Loc G. Ho*
**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Fl.
New York, NY 10023
Telephone: 347-808-6485
E-mail: loc@almeidalawgroup.com

*Pro hac vice* applications to be filed


*Attorneys for Plaintiff and the Putative Class*

-24-

1

## **DEMAND FOR TRIAL BY JURY**

2       Plaintiff, on behalf of himself and the putative class, hereby respectfully demands a trial by

3   jury on all claims for which a jury trial is available.

4

5   Dated: January 26, 2026

*/s/ Wesley M. Griffith*
Wesley M. Griffith, SBN 286390
**ALMEIDA LAW GROUP, LLC**
111 W. Ocean Blvd., Suite 426,
Long Beach, CA 90802
Telephone: 530-490-3178
E-mail: wes@almeidalawgroup.com

F. Peter Silva II, SBN 348070
**TYCKO & ZAVAREEI LLP**
333 H Street, Suite 5000
Chula Vista, CA 91911
Telephone: 202-973-0900
Email: psilva@tzlegal.com

David A. McGee*
**ALMEIDA LAW GROUP, LLC**
3133 Connecticut Ave NW
Washington, DC 20008
Telephone: 202-913-5681
E-mail: dmcgee@almeidalawgroup.com

Loc G. Ho*
**ALMEIDA LAW GROUP, LLC**
157 Columbus Ave, 4th Fl.
New York, NY 10023
Telephone: 347-808-6485
E-mail: loc@almeidalawgroup.com

**Pro hac vice* applications to be filed

*Attorneys for Plaintiff and the Putative Class*

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28